[Cite as *State v. McCauley*, 2025-Ohio-3158.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | Case No. 2024 AP 10 0035 |
| Plaintiff - Appellee | <u>Opinion And Judgment Entry</u> |
| -vs- | Appeal from the Tuscarawas County Court of Common Pleas, Case No. 2021 CR 04 0131 |
| JUSTIN D. MCCAULEY | |
| Defendant – Appellant | Judgment:   Affirmed |
| | Date of Judgment Entry: September 3, 2025 |

**BEFORE:**   ANDREW J. KING, P.J., KEVIN W. POPHAM, J.; DAVID M. GORMLEY, J. Appellate Judges

**APPEARANCES:** RYAN STYER, for Plaintiff-Appellee; BY: KRISTINE BEARD, Assistant Prosecuting Attorney; D. COLEMAN BOND, For Defendant-Appellant

OPINION

*Popham, J.*

{¶1}    Defendant-Appellant Justin McCauley ("McCauley") appeals his conviction and sentence after a jury trial in the Tuscarawas County Court of Common Pleas.  For the reasons which follow, we affirm the decision of the Tuscarawas County Court of Common Pleas.

***Facts and Procedural History***

{¶2}    This matter arose on April 23, 2021, when McCauley was indicted upon two counts of gross sexual imposition involving two different minor complainants.  McCauley entered pleas of not guilty and moved for separate trials on each of the two counts.  The

trial court granted the motion for separate trials and ordered that count one, involving minor R.M., would be tried first, beginning on September 27, 2022.

{¶3} The matter proceeded to trial by jury on count one regarding R.M.'s allegations. McCauley was found not guilty.

{¶4} On October 31, 2022, an appeal was commenced in this matter, by minor complainant R.M. and parents R.P. and N.P. *See State v. McCauley,* 2023-Ohio-2133 (5th Dist.) ("*McCauley I*"). The complainant and parents appealed from the trial court's order overruling their request for R.P. and N.P. to be present throughout trial as designated victims or victim representatives. On June 26, 2023, this Court dismissed that appeal as moot. *McCauley I*, ¶ 19.

{¶5} Trial on count two involving minor M.S. began on January 29, 2024. The jury was unable to reach a unanimous verdict. The trial court declared a mistrial on February 8, 2024.

{¶6} Following the mistrial, McCauley refiled several motions previously addressed by the trial court before the first jury trial, which pertinent to this appeal are as follows:

1. **July 2, 2024** – *Motion in Limine* to exclude Nicole John's forensic interview of the alleged victim, M.S. (Docket Entry No. 627).

2. **July 3, 2024** – *Mr. McCauley's' Motion – Sullivan's Therapy Records (1/29/24 Testimony).* (Docket Entry No. 629).

3. **July 5, 2024** – *Motion in Limine* to exclude the testimony of Carrie Schnirring, a psychologist assistant with Lighthouse Family Center. (Docket Entry No. 648).

{¶7} On July 29, 2024, the trial court held a hearing on the motions. On August 8, 2024, the court entered a judgment entry ruling that portions of M.S.'s forensic interview conducted by Nicole John, those made for medical or diagnostic purposes, were admissible, specifically the segments from 20:00 to 23:00, 24:30 to 27:00, and 27:30 to 33:00. (Docket Entry No. 731.)

{¶8} In a separate judgment entry that day, the court denied McCauley's request for Patricia Sullivan's therapy records. (Docket Entry No. 739.) In a separate entry filed August 8, 2024, the court granted in part the motion to exclude Carrie Schnirring's testimony, prohibiting Schnirring from offering any opinion on M.S.'s "honesty, truthfulness, veracity, consistency, or any similar matters." (Docket Entry No. 742.)

### The jury trial

{¶9} M.S. was born in 2013. 3T. at 513.[1] When M.S. was approximately three years old, her parents enrolled her in "Through the Years Daycare" in Bolivar, Ohio, where McCauley was employed as a daycare worker. *Id.* at 521; 5T. at 862-863. The family first met McCauley in 2018 when M.S. was transitioning from the preschool program. 3T. at 521.

{¶10} M.S.'s mother, J.S., testified that in 2019 McCauley informed her that he provided babysitting services. 3T. at 523; 5T. at 864. McCauley first babysat M.S. on September 21, 2019, at her home. 3T. at 525. At that time, the family had no concerns, and J.S. testified that M.S. appeared to like McCauley. *Id.* at 522; 525-527. McCauley babysat M.S. on four occasions - September, October, November, and December of 2019. 3T. at 525-526; 5T. at 870.

---

[1] For clarity, the transcript of McCauley's jury trial will be referred to as "__T.__" signifying the volume and page number.

{¶11} During the COVID-19 pandemic, the daycare closed. 3T. at 528; 5T. at 871. In the summer of 2020, McCauley organized "COVID camp" at the home of the Goss family. 3T. at 527-29; 5T. at 871-72. Because M.S. was friends with the Goss children, her parents arranged for M.S. to attend the COVID camp two to three times per week while they worked.[2]

{¶12} In the summer of 2020, J.S. observed marked changes in M.S.'s behavior, including frequent outbursts, irritability, and anger. 3T. at 530-531. In January 2021, her parents enrolled M.S. in counseling at Akron Children's Hospital with Patricia Sullivan. 3T. at 531-532. According to J.S., M.S.'s behavior improved after therapy began. *Id.* at 532.

{¶13} On April 2, 2021, McCauley again babysat M.S. in her home. 3T. at 533. J.S. testified that she and her husband left their home around 6:00 p.m. and returned at approximately 9:00 p.m. *Id.* at 533-534. After McCauley left the house, J.S. went to M.S.'s room to get her ready for bed. 3T. at 534. J.S. testified that M.S. said, "mom I have a question". *Id.* J.S. testified that M.S. looked worried and not like her normal self. *Id.* at 535. M.S. asked, "what is that hard thing that sticks up in Justin's [McCauley's] pants?". *Id.* J.S. testified that she asked M.S. if M.S. "saw [McCauley's] privates, did he touch yours?" *Id.* J.S. testified that M.S. mentioned that there was rubbing, and that McCauley makes her sit on his lap and it makes her uncomfortable. *Id.* at 537. J.S. testified that M.S. said that McCauley made her sit on the couch with him and that when she was doing a backbend, he touched her "boob", "and [M.S.] made a statement and well, hey that's my boob." *Id.* J.S. further testified that M.S. said that "like the back of her

---

[2] M.S.'s parents were essential workers during the Covid pandemic. 3T. at 527.

pants came down and her butt was hanging out." *Id.* at 538.  J.S. testified that she told M.S. she was very brave for telling.  *Id.*

{¶14}  J.S. told her husband the following morning and they decided to celebrate Easter with their family and file a report on Monday.  3T. at 539.  J.S. testified that on Monday, April 5, 2021, she contacted the Tuscarawas County Sheriff's Department and spoke with Deputy Heath Manbeck.  *Id.*

{¶15}  Deputy Manbeck testified that he took the report and contacted the Tuscarawas County Department of Job and Family Services ("TCDJFS").  4T. at 640.  Deputy Manbeck testified that he made a written report and asked J.S. to give a written statement about her daughter's disclosure.  *Id.* at 641-642; State's Exhibit 11.  The deputy also collected Ring camera footage from the evening of the disclosure.  *Id.*  The case was then transferred to Deputy Detective Jeff Moore.  *Id.* at 642.

**Forensic Interview**

{¶16}  On April 15, 2021, Nichole John of the TCDJFS conducted a forensic interview of M.S. at Noah's Hope Child Advocacy Center.  3T. at 586.  John described Noah's Hope as an accredited Child Advocacy Center providing a neutral setting for child interviews.  3T. at 585.

{¶17}  John testified that she did not inquire about medical issues, consult any medical provider, or involve medical personnel in the interview.  4T. at 605, 620, 629.  John testified that she understood "medical issues" to mean physical rather than psychological conditions.  *Id.* at 629.  John testified that before the interview began, John regarded M.S. as a victim of sexual abuse.  *Id.* at 606.  John further acknowledged that

one purpose of a forensic interview is to obtain information relevant to medical diagnosis or treatment.  3T. at 581, 590.

{¶18}  Although McCauley initially objected to playing the video of John's interview with M.S., he later requested that the entire recording be shown to the jury.  3T. at 590, 592; 4T. at 635-37.  The jury viewed the complete interview.  3T. at 586, 592; State's Exhibit 14.

### Trauma Evaluation

{¶19}  Carrie Schnirring, a psychological assistant at Lighthouse Family Center, conducted M.S.'s trauma evaluation.  4T. at 672.  Schnirring testified that, holding only a master's degree, she could not be independently licensed in Ohio and that her reports required review and signature by her clinical supervisor, licensed psychologist Dr. Seandra Walker.  4T. at 673.

{¶20}  The trial court qualified Schnirring as an expert in child sexual abuse and trauma.  4T. at 679.  Schnirring testified that M.S. was referred to her in October 2022 by the victim advocate in the Tuscarawas County Prosecutor's Office.  4T. at 682. Schnirring conducted a sexual abuse and trauma evaluation and on January 5, 2023, issued a report based on interviews with M.S. and her parents, collateral records, and behavioral checklist data.  4T. at 685-86; State's Exhibit 19.

{¶21}  According to Schnirring, J.S. reported that M.S. had become irritable, prompting her parents to suspect ADHD, though testing ruled it out.  4T. at 693. Schnirring testified M.S. was taken by her parents to therapist Patricia Sullivan for anxiety treatment, but Schnirring did not review Sullivan's counseling records.  *Id.*

{¶22} Schnirring testified that M.S. twice denied that McCauley touched her breast or buttocks or forced her to touch his genitals. 4T. at 698. During a second meeting, M.S. disclosed that McCauley "did weird things" to her. 4T. at 698. Schnirring testified that M.S. described being made to cuddle against her will; when she tried to move away, McCauley would pick her up, place her back on the couch, and put "his private on her private." Schnirring testified that, using teddy bears, M.S. demonstrated sitting on his lap in a straddling position, during which his genital area contacted hers. 4T. at 698-99.

{¶23} Schnirring testified that at a third meeting on November 29, 2022, M.S. stated the touching occurred at the Goss residence when the children were asleep. To describe the sensation, M.S. picked up a marker and said it felt similar, but "a little bendy." 4T. at 700.

{¶24} Schnirring testified that behavioral checklists completed by J.S. suggested M.S. met the criteria for post-traumatic stress disorder (PTSD). 4T. at 707. Schnirring testified that she cited M.S.'s advanced sexual knowledge, descriptions of McCauley's anatomy, and contextual details—such as the grooming function of forced cuddling—as supporting her diagnosis. She also noted M.S.'s anger and indignation when discussing McCauley. *Id.* at 707-708.

{¶25} Schnirring diagnosed M.S. as suffering from PTSD and recommended ongoing trauma-focused counseling, including therapy addressing sexual trauma. 4T. at 709-10, 712.

## M.S.'s Testimony

{¶26} M.S. testified that she enjoyed her time at Through the Years daycare, describing McCauley as nice and fun. 3T. at 469-473. M.S. testified about various fun activities that she and McCauley did when he was babysitting. *Id.* at 469-473.

{¶27} M.S. testified that after McCauley left her house after the incident, she told her mother what happened. 3T. at 475. M.S. testified that she told her mother that McCauley put his private on her, and when he scratched her back, he moved his hand towards her boob. *Id.* M.S. testified that this occurred on the living room couch. *Id.* at 475. M.S. testified that she could not remember how she ended up on the living room couch with McCauley. *Id.* M.S. also testified that she does not know how many times this happened, but M.S. testified that McCauley put his private on her private, and moved his hand toward her boob, both at her home and at the Goss house. 3T. at 473-475; 476-483.

{¶28} M.S. also testified that she cannot remember what it felt like when McCauley put his private part on hers because it was too long ago. 3T. at 478. M.S. testified that she could not remember if McCauley's private part looked the same during the incident as it did when they were doing fun activities. *Id.* at 478.

{¶29} M.S. testified that she did not remember how McCauley put his private on her private. 3T. at 486-487. M.S. testified that neither she nor McCauley ever had their clothes off. *Id.* M.S. testified that she could not remember telling anyone that McCauley did this to her every time McCauley was babysitting her at her house. *Id.* at 489. M.S. testified that she did not remember telling Nicole John that McCauley took M.S.'s hand and put it on McCauley's private area. *Id.* at 492. M.S. testified that she cannot

remember if that ever happened. *Id.* M.S. testified that she could not remember telling Carrie Schnirring that M.S. went into the bathroom and sat on the toilet with her cell phone to get away from McCauley. *Id.* at 496. M.S. testified that she has never had a cell phone. *Id.* at 496-498.

**Defense Expert Testimony**

{¶30}   The trial court qualified Dr. Leigh Hagan as an expert in clinical and forensic psychology. 5T. at 785.

{¶31}  Dr. Hagan testified that he reviewed M.S.'s forensic interview, Ms. Schnirring's report, and some of Schnirring's testing materials that she used for her evaluation. 5T. at 785-786. Dr. Hagan further testified that he also relied on the two published works that appeared in Schnirring's report. *Id.*

{¶32}   Dr. Hagan explained the concept of "alternate hypothesis," emphasizing the importance of considering alternative explanations for a child's statements. Dr. Hagan testified that after reviewing the April 15, 2021 interview he saw no evidence that John explored alternative explanations. Dr. Hagan testified that knowing to whom M.S. first disclosed the allegations, the feedback she received, and whether her account changed over time would be useful, as repeated retelling can reshape a child's narrative. 5T. at 786-787.

{¶33}   Dr. Hagan testified concerning "pull to affiliate," a dynamic in which a child aligns with an adult's perspective due to a desire for acceptance. Dr. Hagan testified that he observed such dynamics in John's interview through praise such as "you are so brave" and "you are saving lives," which he considered inappropriate for a forensic interview. 5T. at 788-789.

{¶34} Dr. Hagan testified that M.S. interacted with John almost as a peer, occasionally patronizing the interviewer, and displayed no signs of fear, anxiety, or reticence. 5T. at 790.

{¶35} Regarding Schnirring's evaluation, Dr. Hagan testified that Schnirring's role was not to determine whether abuse occurred but to assess the type and extent of sexual abuse. He characterized the behavioral checklist as non-diagnostic and the UCLA PTSD Index as a symptom inventory, not a test. Dr. Hagan testified that PTSD diagnoses require objective evidence of a life-threatening event or sexual violence causing functional impairment. 5T. at 794-807. Dr. Hagan testified that Schnirring's report lacked sufficient evidence to support a PTSD diagnosis. *Id.* at 809.

## Patricia Sullivan's Testimony

{¶36} Sullivan testified that she was M.S.'s counselor but only testified generally about her practice and not about her professional relationship with M.S. 5T. at 828. Sullivan testified that she is a mandated reporter of child sexual abuse. *Id.* at 829. Sullivan testified that during her initial intake appointment with therapy clients, she specifically asks the child if they have been sexually abused. *Id.* at 839-840. Sullivan testified that following the initial intake appointment, she asks her clients if anything bad, sad, or scary has happened to them since they had last seen each other. *Id.* at 831-832.

## McCauley's Testimony

{¶37} McCauley testified that he developed an interest in childcare while helping care for his younger brother with autism, later working at Through the Years daycare and providing childcare privately. He began babysitting M.S. in August 2019 and denied any

inappropriate contact. He described in detail each occasion he babysat M.S. 5T. at 861-881.

### The Verdict and Sentence

{¶38} The jury found McCauley guilty as charged. Sentencing was deferred pending completion of a presentence investigation report. On September 16, 2024, the trial court sentenced McCauley to 36 months incarceration.

### *Assignments of Error*

{¶39} McCauley raises five assignments of error for our consideration,

{¶40} "I. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION IN LIMINE SEEKING TO EXCLUDE THE CHILD ADVOCACY CENTER INTERVIEW AND FINDING THAT SPECIFIC PORTIONS OF SAID INTERVIEW WERE ADMISSIBLE PURSUANT TO EVID.R. 803(4), AND BY PERMITTING THIS EVIDENCE TO BE PRESENTED AT TRIAL OVER APPELLANT'S OBJECTION."

{¶41} "II. THE APPELLANT WAS DENIED HIS RIGHT TO DUE PROCESS AND RIGHT TO A FAIR TRIAL GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND OHIO CONSTITUTION WHEN THE STATE COMMITTED A *BRADY* VIOLATION BY FAILING TO DISCLOSE EXCULPATORY EVIDENCE OF M.S.'S COUNSELING RECORDS."

{¶42} "III. THE APPELLANT WAS DENIED HIS RIGHT TO DUE PROCESS AND RIGHT TO A FAIR TRIAL GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND OHIO

CONSTITUTION WHEN THE TRIAL COURT PERMITTED EXPERT TESTIMONY THAT OPINED AS TO THE VERACITY OF M.S.'S STATEMENTS."

{¶43} "IV. THE APPELLANT'S SENTENCE VIOLATES THE CONSTITUTIONAL PROHIBITIONS AGAINST CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 9 OF THE OHIO CONSTITUTION."

{¶44} "V. THE APPELLANT WAS DENIED A FAIR TRIAL BY THE CUMULATIVE ERRORS BY THE TRIAL COURT."

I.

{¶45} In his first assignment of error, McCauley contends that the trial court abused its discretion by admitting portions of the Child Advocacy Center ("CAC") interview conducted by Nicole John on April 15, 2021. He argues that the statements do not fall within the hearsay exception under Evid.R. 803(4) because they were not made for purposes of medical diagnosis or treatment.

{¶46} Before trial, McCauley objected to the admissibility of the interview. *See* T. *Motion Hearing,* July 29, 2024, at 4-6. The court, however, ruled on August 8, 2024, that certain segments of the interview—specifically those portions it deemed medical in nature—could be admitted. The admissible segments, or "snippets," were identified as 20:00-23:00, 24:30-27:00, and 27:30-33:00 of the recording. (Docket Entry No. 731.)

{¶47} At trial, McCauley renewed his objection. 3T. at 581-592. The court noted that John testified the interview served a "medical purpose," and it therefore admitted the snippets. *Id.* at 591. McCauley then requested that, if any part of the interview came in,

the entire recording should be admitted. The trial court granted that request, and the full interview was played for the jury.  *Id.* at 592.

## Standard of Review – Admissibility of Evidence

{¶48} A trial court has broad discretion in determining the admissibility of evidence, provided that discretion is exercised in accordance with the rules of procedure and evidence. *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991); *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus.  Even where an abuse of discretion is shown, a judgment will not be reversed unless the error affected the substantial rights of the adverse party or was inconsistent with substantial justice.  *Beard v. Meridia Huron Hosp.*, 2005-Ohio-4787, ¶ 20, citing *O'Brien v. Angley*, 63 Ohio St.2d 159, 164 (1980).

{¶49}  Abuse of discretion is a high standard, requiring a showing of "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993), citing *State v. Jenkins*, 15 Ohio St.3d 164, 222 (1984), *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4 (1997).*  An abuse of discretion may also be found where the court's reasoning is untenable, legally incorrect, or results in a denial of justice. *See Tennant v. Gallick*, 2014-Ohio-477, ¶ 35 (9th Dist.); *In re Guardianship of S.H.*, 2013-Ohio-4380, ¶ 9 (9th Dist.); *State v. Firouzmandi*, 2006-Ohio-5823, ¶ 54 (5th Dist.); *Donaldson v. Donaldson*, 2024-Ohio-4597, ¶ 70 (5th Dist.).

## *Hearsay is Usually Not Admissible at Trial*

{¶50}  Hearsay is, in essence, secondhand testimony: an out-of-court statement offered for the truth of the matter asserted.  Evid.R. 801(C).  Because such statements lack the safeguards of in-court testimony, *i.e.,* an oath, the ability to observe the

speaker's demeanor, and cross-examination, they are generally excluded.  Evid.R. 802; *State v. Steffen*, 31 Ohio St.3d 111, 119 (1987).  As the United States Supreme Court observed, hearsay is especially suspect because the declarant may be lying, mistaken, or misremembering, and the listener may misunderstand. *Williamson v. United States*, 512 U.S. 594, 598 (1994).

{¶51}  Evid.R. 803(4) provides one well-established exception to the prohibition against admitting hearsay at trial: statements made for purposes of medical diagnosis or treatment.  Because physicians rely on accurate patient histories to diagnose and treat conditions, such statements carry a presumption of reliability and may be admitted even when the declarant does not testify. *See White v. Illinois*, 502 U.S. 346, 356-357 (1992); *State v. Davis*, 2024-Ohio-1504, ¶ 31 (5th Dist.).

## The *Arnold Framework*

{¶52}  In *State v. Arnold*, 2010-Ohio-2742, the Supreme Court of Ohio considered the admissibility of statements made during interviews at child-advocacy centers.  *Arnold* involved a Confrontation Clause challenge.  The issue in *Arnold* was whether a child's statements during an interview were for medical diagnosis or treatment, making them "non-testimonial," or whether they primarily served a forensic or investigative purpose, making them "testimonial" in violation of the defendant's confrontation rights.

{¶53}  The Supreme Court first noted that child-advocacy centers are unique insofar as a single interview with a child serves "dual purposes," which are: "(1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim." *Arnold* at ¶ 33.

{¶54} The Court carefully divided the child's statements into two categories. Some were investigative—such as details about the locked door, clothing, and the defendant's appearance—and thus inadmissible hearsay under Evid.R. 803(4). *Id.* at ¶ 34.

{¶55} By contrast, statements describing the acts of abuse (e.g., touching, penetration, oral contact) were necessary for medical evaluation and therefore admissible under Evid.R. 803(4). *Arnold* at ¶¶ 37-38. The Court emphasized that statements should be assessed individually, admitting those necessary for medical purposes while excluding those that are not. *Id.* at ¶ 42. The fact that law enforcement observed the interview or later used the information in prosecution did not alter its admissibility. *Id.* at ¶ 43.

{¶56} A child's statements made to a social worker regarding sexual abuse she experienced are admissible under Evid.R. 803(4) when made for the purposes of medical diagnosis or treatment. *State v. Muttart*, 2007-Ohio-5267, ¶ 39; *State v. Keene*, 2023-Ohio-4761, ¶42 (5th Dist.). It should also be noted the child's statements in *Arnold* were made to a social worker at the Center for Child and Family Advocacy at Nationwide Children's Hospital ("CCFA"). *State v. Arnold,* 2010-Ohio-2742, ¶ 1.

{¶57} The Court in *Muttart*, provided additional factors for determining whether a child's statements were made for medical purposes, including the use of leading questions, the child's motive to fabricate, the child's understanding of the need to tell the truth, age, consistency of statements, and whether the interview followed proper protocols. *Id.* at ¶ 49. Ultimately, credibility remains subject to cross-examination at trial. *Id.* at ¶ 50.

### Application to the Present Case

{¶58}   Here, the trial court found that only the "snippets" were admissible under Evid.R. 803(4) because they were made for purposes of medical diagnosis or treatment. Our own review of the snippets reveal that the snippets were consistent with M.S.'s trial testimony concerning McCauley's conduct, including rubbing his genitals against hers, requiring her to touch his genitals, the number and location of incidents, and the fact that both were clothed.   However, other portions of the interview—for example, M.S.'s description of McCauley smiling, her teasing him, or where she was looking—would not fall within Evid.R. 803(4) under *Arnold*.

{¶59}   To be sure, although the trial court ruled that the jury was entitled to hear only "snippets" of the forensic interview, appellant requested that the entire interview be played at trial.   Even assuming some portions were erroneously admitted, any error was harmless.   Under the three-part analysis set forth in *State v. Harris*, 2015-Ohio-166, ¶ 37, an appellate court considers: (1) whether the error prejudiced the defendant, (2) whether it was harmless beyond a reasonable doubt, and (3) whether the remaining evidence establishes guilt beyond a reasonable doubt once the inadmissible evidence is excised. *See also State v. Arnold*, 2016-Ohio-1595, ¶ 50; *State v. Boaston*, 2020-Ohio-1061, ¶ 63.

{¶60}   Applying that framework, we find beyond a reasonable doubt that the admission of the snippets did not contribute to McCauley's conviction.   *See State v. Aeschilmann*, 2014-Ohio-4462, ¶¶ 95-96.   M.S. testified at trial and was subject to cross-examination.   The jury had the opportunity to assess her demeanor, credibility, and

memory. Furthermore, even without the snippets, the remaining evidence established McCauley's guilt beyond a reasonable doubt[3].

{¶61} Accordingly, McCauley's first assignment of error is overruled.

II.

{¶62} In his second assignment of error, McCauley contends that Patricia Sullivan's counseling records contained exculpatory evidence and that the State's failure to obtain and disclose those records violated *Brady v. Maryland*, 373 U.S. 83 (1963).

**Standard of Review – Admissibility of Evidence**

{¶63} A trial court has broad discretion in determining the admissibility of evidence, so long as that discretion is exercised in accordance with the rules of procedure and evidence. *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991); *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. Even where an abuse of discretion is established, reversal is warranted only if the error affected the substantial rights of the adverse party or was inconsistent with substantial justice. *Beard v. Meridia Huron Hosp.*, 2005-Ohio-4787, ¶ 20, citing *O'Brien v. Angley*, 63 Ohio St.2d 159, 164 (1980).

{¶64} Abuse of discretion is a high standard, requiring a showing of "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993), citing *State v. Jenkins*, 15 Ohio St.3d 164, 222 (1984), *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4 (1997)*. It may also be found where the court's reasoning is untenable, legally incorrect, or results in a denial of justice. See *Tennant v.*

---

[3] We note McCauley has not challenged the sufficiency or weight of the evidence related to his conviction.

*Gallick*, 2014-Ohio-477, ¶ 35 (9th Dist.); *In re Guardianship of S.H.*, 2013-Ohio-4380, ¶ 9 (9th Dist.); *State v. Firouzmandi*, 2006-Ohio-5823, ¶ 54 (5th Dist.); *Donaldson v. Donaldson*, 2024-Ohio-4597, ¶ 70 (5th Dist.).

### *Procedural History Regarding Sullivan's Records*

{¶65} On October 25, 2021, the State submitted Sullivan's counseling records to the trial court, requesting that the court conduct an in-camera review to determine whether the records contained exculpatory evidence. (Docket Entry No. 56.) The trial court agreed and indicated it would decide whether any documents should be disclosed. (Docket Entry No. 116, Judgment Entry Jan. 14, 2022.) A hearing was held on March 24, 2022, and the following day the trial court memorialized its decision to review the records. (Docket Entry No. 151, Judgment Entry Mar. 25, 2022.)

{¶66} On April 26, 2022, McCauley filed a subpoena *duces tecum* to Sullivan, seeking all counseling records concerning M.S. from her initial consultation through the present. A victim advocate moved to quash the subpoena. By judgment entry filed May 20, 2022, the trial court found, after conducting a hearing, that McCauley had shown a reasonable probability, grounded in demonstrable fact, that the records contained material relevant to the defense. Citing *United States v. Nixon*, 418 U.S. 683, 699-700 (1974), the court denied the motion to quash and ordered that the records be delivered under seal for in-camera review. The court further stated that, after reviewing the documents, it would determine whether any portions should be disclosed. (Docket Entry No. 192.)

{¶67} Following its in-camera review, the trial court determined that the records "do not contain evidence favorable to the accused either material to guilt or punishment

under *Brady v. Maryland*, 373 U.S. 83, 87 (1963)." The court also concluded that the records were not relevant to the proceeding and that confidentiality concerns outweighed disclosure. (Docket Entry No. 197, Judgment Entry June 24, 2022.)

{¶68} McCauley subsequently filed motions seeking reconsideration on October 23, November 22, and December 12, 2023. The trial court denied each motion. (Docket Entry No. 520, Jan. 12, 2024.)

{¶69} Before the first trial involving M.S., McCauley again moved for disclosure of the records. On January 29, 2024, the trial court conducted a limited voir dire of Patricia Sullivan and again denied the request, ruling that the victim's rights outweighed McCauley's asserted need for the records[4]. (Docket Entry No. 603, Judgment Entry Feb. 8, 2024.)

{¶70} McCauley renewed his request on July 3, 2024, which the trial court denied on August 8, 2024. (Docket Entry No. 727).

### *Privilege and Brady*

{¶71} R.C. 4732.19 provides that medical, counseling, and psychotherapy records are privileged, although the privilege is not absolute.

{¶72} Due process requires the prosecution to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). This duty extends to impeachment evidence. *United States v. Bagley*, 473 U.S. 667 (1985). In *Ritchie*, the Supreme Court held that the appropriate procedure for resolving the tension between a defendant's right to exculpatory evidence and the confidentiality of protected

---

[4] The voir dire of Sullivan is attached as Exhibit 1 to *Mr. McCauley's Motion-Sullivan's Therapy Records (1/29/24 Testimony)*, filed July 3, 2024. (Docket Entry No. 629).

records is for the trial court - not defense counsel - to conduct an in-camera review. *Id.* at 59-60. The Court explained that permitting defense counsel direct access would unnecessarily compromise the confidentiality interests at stake. *Id.*

{¶73} Here, the Sullivan counseling records were provided to the trial court, and the trial court conducted an in-camera review for potentially exculpatory material. The trial court determined the records contained no evidence favorable to the defense. Accordingly, no *Brady* violation occurred. McCauley received precisely what due process guarantees: judicial review of the records for exculpatory evidence.

**Conclusion**

{¶74} Because the trial court conducted the required in-camera inspection of Sullivan's counseling records and determined they contained no exculpatory information, McCauley's due process rights under *Brady* were not violated. The State complied with its obligations by submitting the records for judicial review, and the trial court properly balanced the defendant's rights against the confidentiality protections afforded to the victim.

{¶75} Accordingly, McCauley's second assignment of error is overruled.

III.

{¶76} In his third assignment of error, McCauley contends that the trial court erred in allowing Carrie Schnirring to testify about M.S.'s credibility.

{¶77} The Ohio Supreme Court has held that an expert may not tell the jury whether a child is telling the truth. *State v. Boston*, 46 Ohio St.3d 108, 128-29 (1989) *overruled, in part, on other grounds by State v. Muttart, 2007-Ohio-5267*. The reason is simple: credibility belongs to the jury, not the expert. As the Court explained, it is the

trier of fact - not a witness on the stand - who bears the duty of assessing truthfulness. *Id.* at 129, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312 (1988) (Holmes, J., concurring).

{¶78} This principle also guards against what courts describe as "bolstering"- that is, suggesting to the jury that a witness's testimony is supported by evidence outside their view. *State v. Hernandez*, 2018-Ohio-5031, ¶ 12 (8th Dist.), quoting *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997). Testimony that invades the jury's role by vouching for another witness's credibility is classic bolstering and has long been disapproved. *State v. Knuff*, 2024-Ohio-902, ¶ 117; *State v. J.E.*, 2024-Ohio-4461, ¶ 33 (10th Dist.). This rule applies with equal force when the witness is a child victim. *State v. Denson*, 2023-Ohio-847, ¶ 25 (1st Dist.), citing *Boston*, 46 Ohio St.3d at 129.

{¶79} That said, Ohio courts also recognize a distinction. Direct testimony that a child is truthful is always off limits. But testimony that merely provides background or context - without crossing the line into vouching - may be admissible. *State v. Hughes*, 2015-Ohio-151, ¶ 48 (10th Dist.); *State v. Stowers*, 81 Ohio St.3d 260, 262-63 (1998). The line is clear: experts cannot replace the jury's judgment with their own.

{¶80} Equally well-settled is that an expert opinion must rest on something more than the child's bare allegations. Without corroborating indicators - whether physical evidence, observed behavior, or other objective signs - the testimony becomes nothing more than an endorsement of the child's story. Courts have condemned such testimony as tantamount to vouching. *State v. Schewirey*, 2006-Ohio-7054, ¶¶ 48-49 (7th Dist.) (citation omitted); *State v. Britta*, 2010-Ohio-971, ¶ 70 (11th Dist.), *citing State v. Johnson*, 2008-Ohio-6657, ¶ 32 (8th Dist.). By contrast, when an expert draws from a

broad set of data - such as collateral records and observed behaviors - the testimony is not simply a comment on veracity and may properly aid the jury. *Britta*, ¶ 70; *State v. Williams*, 2022-Ohio-2245, ¶ 95 (5th Dist.).

{¶81} Here, Schnirring did not rely solely on M.S.'s allegations. She considered interviews with M.S. and her parents, collateral records, and behavioral checklist data. *See* 4T. at 685-86; State's Exhibit 19. Her opinion therefore rested on multiple sources of information, not just the child's statements.

{¶82} Even if we assume the trial court erred in admitting Schnirring's testimony, the error does not warrant reversal. The harmless-error test asks three things: Did the error prejudice the defendant? Was it harmless beyond a reasonable doubt? And, once the challenged testimony is set aside, does the remaining evidence still establish guilt beyond a reasonable doubt? *State v. Harris*, 2015-Ohio-166, ¶ 37; *State v. Boaston*, 2020-Ohio-1061, ¶ 63; *State v. Brook*, 2024-Ohio-3074, ¶72 (5th Dist.).

{¶83} Applying that test, McCauley cannot show prejudice. M.S. herself testified at trial and was subject to cross-examination. The jury observed her demeanor, measured her candor, and weighed her potential bias. They were fully equipped to make their own judgment about her credibility. *State v. Butler*, 2024-Ohio-4651, ¶ 95 (5th Dist.).

{¶84} We are satisfied beyond a reasonable doubt that Schnirring's testimony - even if it implied some belief in M.S.'s account - did not affect the outcome of the trial. The jury's verdict was rooted in M.S.'s testimony and the evidence as a whole, not in any suggestion from Schnirring. The result would have been the same without it.

{¶85} For these reasons, McCauley's third assignment of error is overruled.

IV.

{¶86} In his fourth assignment of error McCauley argues that a 36-month sentence consecutive to his three years of house arrest on pretrial release is excessive cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

{¶87} The Eighth Amendment, mirrored in Article I, Section 9 of the Ohio Constitution, forbids punishments that are excessive or barbaric, providing: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Courts have long held that a sentence does not violate these provisions unless it is so grossly disproportionate to the offense that it shocks the moral sense of the community. *State v. Chaffin*, 30 Ohio St.2d 13 (1972). As the Supreme Court of Ohio emphasized, "[a]s a general rule, a sentence that falls within the terms of a valid statute cannot amount to a cruel and unusual punishment." *McDougle v. Maxwell*, 1 Ohio St.2d 68, 69 (1964).

{¶88} Proportionality review under the Eighth Amendment traditionally considers: (1) the gravity of the offense and the severity of the penalty; (2) sentences imposed for similar crimes within the jurisdiction; and (3) sentences for the same offense in other jurisdictions. *State v. Morin*, 2008-Ohio-6707, ¶ 69 (5th Dist.), citing *Solem v. Helm*, 463 U.S. 277, 290-92 (1983). But the Supreme Court of Ohio has made clear that this analysis does not extend to aggregate terms arising from consecutive sentences. *State v. Hairston*, 2008-Ohio-2338, ¶ 20. Unless an individual sentence is itself grossly disproportionate to the offense, the total term resulting from consecutive sentences is not unconstitutional. *Id.*; *State v. Williams*, 2017-Ohio-8898, ¶ 31 (1st Dist.).

{¶89} McCauley identifies no case - Ohio, out-of-state, or federal - where a sentence comparable to his was found unconstitutional. His thirty-six-month term falls well within the statutory range authorized by R.C. 2929.14(A)(3)(a) and is not even the maximum available penalty. That fact alone is fatal to his Eighth Amendment claim.

{¶90} Equally unpersuasive is McCauley's reliance on his pretrial house arrest. Ohio courts uniformly hold that electronic monitoring as a condition of bail does not qualify as "confinement" for purposes of jail-time credit. *State v. Marshall*, 2019-Ohio-1810, ¶ 15 (5th Dist.); *State v. Bates*, 2004-Ohio-6856, ¶ 14 (5th Dist.); *State v. Struder*, 2001 WL 24616 (5th Dist. Mar. 5, 2001). More importantly, McCauley's circumstances under house arrest hardly resembled incarceration. He remained in his home, continued working, and was permitted to travel - even out of state - on multiple occasions to meet with counsel. To equate these privileges with the hardships of imprisonment strains credibility and undercuts his claim of disproportionality.

{¶91} Finally, McCauley has not met his burden under Ohio's sentencing statutes. A trial court is not required to discuss every factor in R.C. 2929.12 on the record, and the defendant must affirmatively show either that the court ignored the statutory criteria or that the sentence is strikingly inconsistent with them. *State v. Hull*, 2017-Ohio-157, ¶ 18 (11th Dist.); *State v. Washington*, 2022-Ohio-625, ¶ 134 (5th Dist.). McCauley makes no such showing. He has not clearly and convincingly established that the trial court failed to consider the purposes and principles of felony sentencing or that his sentence is contrary to law.

{¶92} In short, McCauley's thirty-six-month prison term is lawful, proportionate, and well within the trial court's discretion. His attempt to transform pretrial house arrest into a basis for constitutional relief is unavailing.

{¶93} McCauley's fourth assignment of error is therefore overruled.

V.

{¶94} In his fifth assignment of error, McCauley argues that the effect of evidence that was improperly admitted and the alleged *Brady* violation as set forth in assignments of error 1, 2 and 3 denied him a fair trial.

{¶95} In *State v. Brown*, 2003-Ohio-5059, the Supreme Court of Ohio recognized the doctrine of cumulative error. However, as explained in *State v. Bethel*, 2006-Ohio-4853, ¶ 197, it is simply not enough to intone the phrase "cumulative error." *State v. Sapp*, 2004-Ohio-7008, ¶ 103.

{¶96} Where we have found that the trial court did not err, cumulative error is simply inapplicable. *State v. Carter*, 2003-Ohio-1313, ¶ 37 (5th Dist.). To the extent that we have found that any claimed error of the trial court was harmless, or that claimed error did not rise to the level of a *Brady* violation, we conclude that the cumulative effect of such claimed errors is also harmless because taken together, they did not materially affect the verdict. *State v. Leonard*, 2004-Ohio-6235, ¶ 185.

{¶97} As this case does not involve multiple instances of error, McCauley's claim of cumulative error must fail.

{¶98} McCauley's fifth assignment of error is overruled.

For the reasons stated in our Opinion, the judgment of the Tuscarawas County Court of Common Pleas is affirmed.

Costs to Appellant.

By: Popham , J.

King, P.J. and

Gormley, J. concur.